# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:22-CR-00327 |
| | ) | |
| [1] CHESTER GALLAGHER | ) | JUDGE TRAUGER |
| [2] HEATHER IDONI | ) | |
| [3] CALVIN ZASTROW | ) | |
| [4] COLEMAN BOYD | ) | |
| [5] CAROLINE DAVIS | ) | |
| [6] PAUL VAUGHN | ) | |
| [7] DENNIS GREEN | ) | |
| [8] EVA EDL | ) | |
| [9] EVA ZASTROW | ) | |
| [10 JAMES ZASTROW | ) | |
| [11 PAUL PLACE | ) | |

**DEFENDANTS' AMENDED MOTION TO DISMISS THE INDICTMENT ON GROUNDS OF SELECTIVE PROSECUTION; THAT FACE IS AN UNCONSTITUTIONAL CONTENT-BASED REGULATION OF SPEECH; VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT AND THE FREE EXERCISE CLAUSE; FOR LACK OF JURISDICTION; AND MOTION TO DISMISS THE CONSPIRACY CHARGE, AND SUPPORTING MEMORANDUM OF LAW**

COME NOW Defendants Paul Vaughn, Coleman Boyd, Caroline Davis, Eva Edl, Chester Gallagher, Dennis Green, Heather Idoni, Paul Place, Calvin Zastrow, Eva Zastrow and James Zastrow, by and through counsel, and move the Court pursuant to LCrR 12.01(b) and Rule 12(b)(3)(A)(iv) of the Federal Rules of Criminal Procedure to dismiss the above-referenced Indictment. Defendants submit that the Government has engaged in selective and/or vindictive prosecution motivated by an intent to punish Defendants for the content of their viewpoints and their protected expressions thus making this case an unconstitutional application of the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248(a) ("FACE"). In addition, FACE is an unconstitutional content-based regulation of speech; as applied, it violates the Religious Freedom

1

Restoration Act, 42 U.S.C. § 2000bb ("RFRA"), as well as the Free Exercise Clause of the First Amendment; and this Court lacks jurisdiction because, especially after the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*[1], FACE is an invalid exercise of Congress' Commerce Clause authority. Additionally, Defendants Paul Vaughn, Chester Gallgher, Heather Idoni, Calvin Zastrow, Coleman Boyd, Caroline Davis, and Dennis Green move the Court to dismiss Count One, the conspiracy charge, on the grounds that after *Dobbs*, there are no civil rights at issue, the Government's motivation was to suppress and punish Defendants' speech, the penalty is disproportionate to the crime, and charging a felony conspiracy for the alleged misdemeanor FACE violation is contrary to the intent of Congress.

In further support hereof, Defendants would show to the Court the following:

## MEMORANDUM OF LAW

### Introduction

With over 170 uncharged incidents of destruction and vandalism at pro-life centers and churches across the country, the U.S. Department of Justice instead haled Paul Vaughn and ten other Defendants into court for a single alleged nonviolent violation of the Freedom of Access to Clinic Entrances Act ("the FACE Act" or "FACE"), 18 U.S.C. § 248, which occurred over a year and a half before the Indictment was filed at a multi-tenant facility that also housed an abortion facility in Mt. Juliet, Tennessee. The Indictment also charges a conspiracy among seven of the Defendants to commit the alleged violation of FACE. The DOJ has demonstrated clear and illegal hostility toward the pro-life viewpoint in its statements and enforcement decisions, running roughshod over fundamental religious freedoms and free speech rights, and bringing an

---

[1] 142 S.Ct. 2228 (June 24, 2022).

2

illegal selective prosecution here. As applied to the instant Defendants, the FACE Act is being used as a tool for viewpoint discrimination.

## **Factual Allegations**

The Indictment was filed October 3, 2022 – nineteen months after the alleged incident. It contains two counts. (ECF 3) The second alleges that on March 5, 2021, the Defendants violated FACE[2] by creating a "blockade" at an abortion facility known as "carafem," located in Mt. Juliet, Tennessee, by standing or sitting in front of the facility's entrances. The first count alleges a violation of 18 U.S.C. § 241, which prohibits conspiracy to interfere with civil rights, by planning the "blockade." In particular, the Indictment alleges that a single patient, "Patient A," "walked into the crowded hallway but stopped short of the Clinic entrance" after some of the Defendants spoke to her. *Id*. at ¶ 19. It also alleges that a single employee, Employee A, was unable to return to the Clinic. *Id*. at ¶ 20.

## **Legal Standards**

A defendant may challenge "a defect in the indictment or information"—including its constitutionality—as long as "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B). In making such a challenge, a defendant may challenge a statute as unconstitutional on its face or as applied to the conduct alleged. *See Hodge v. Talkin*, 799 F.3d 1145, 1156–57 (D.C. Cir. 2015). In order to show that a statute is facially unconstitutional, a defendant must demonstrate that the statute is unconstitutional in all of its applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Speet v. Schuette*, 726 F.3d 867, 871 (6th Cir. 2013). In contrast, an as-applied challenge need

---

[2]  The Indictment alleges a violation of 18 U.S.C. § 248(a)(1) and (2), but subsection (2) is inapplicable here because it protects those seeking to exercise their religious freedom rights "at a place of religious worship." *Id*. That part of the Indictment should be dismissed forthwith.

only show that the statute is "an unconstitutional exercise of congressional power" as applied to the defendant's alleged conduct. *Speet v. Schuette*, 726 F.3d at 872.

On a motion to dismiss the indictment, the indictment's factual allegations should be taken as true. A Rule 12 motion is not the appropriate vehicle for addressing the sufficiency of the government's evidence. *United States v. Kettles*, No. 3:16-cr-163-1 (M.D. Tenn. May 15, 2017). However, Rule 12(d) clearly envisions that a district court may make preliminary findings of fact necessary to decide the questions of law presented by a pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact. *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976); *Unites States v. Lundy*, 3:15-cr-146 (M.D. Tenn. 2016) (citing *United States v. Craft*, 105 F.3d 1123, 1126 (6th Cir. 1997)).

## I. THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT HAS ENGAGED IN SELECTIVE PROSECUTION.

In this case, the FACE Act is unconstitutional as applied to Defendants. FACE "does not directly apply to speech, but rather prohibits three types of conduct—use of force, threat of force, and physical obstruction—which are not protected by the First Amendment." *Norton v. Ashcroft*, 298 F.3d 547, 552 (6th Cir. 2002) (footnote and citations omitted). But "an erroneous application of F.A.C.E. threatens to impinge First Amendment activity." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 195 (2d Cir. 2001); *see also Norton*, 298 F.3d at 552 ("we recognize the Act might incidentally affect some conduct with protected expressive elements, such as peaceful but obstructive picketing") (internal quotation marks and citations omitted). And where enforcement is based on the government's "disapproval of a subset of messages it finds offensive," *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part, joined by Ginsburg, Sotomayor, and Kagan, JJ.), the Constitution prohibits it. Conduct may be regulated as long as it is not regulated because of a person's viewpoint. It is not a

4

Constitutional defect in the text of FACE that is at issue here but rather a defect in its application – selective enforcement for viewpoint discrimination.

### A. Selective Enforcement for Viewpoint Discrimination Is Constitutionally Prohibited.

The enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination. To be sure, the Attorney General and United States Attorneys have broad discretion to enforce criminal laws, and they "have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting U.S. Const., Art. II, § 3 and citing 28 U.S.C. §§ 516, 547). Notwithstanding such broad latitude, a "prosecutor's discretion is 'subject to constitutional constraints.'" *Id*. (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). One of these constraints is that a prosecution "may not be based on an unjustifiable standard "such as race, religion, or other arbitrary classification." *Id*. *See also* Fed. R. Crim. P. 12(b)(3)(A)(iv) (selective or vindictive prosecution is ground for pre-trial dismissal). Neither may the Government act based on its "disapproval of a subset of messages it finds offensive," as "[t]his is the essence of viewpoint discrimination." *Matal* , 582 U.S. 218, 248 (Kennedy, J., concurring in part).

To address the problems of enforcement of an otherwise valid law in such a way as to violate constitutional rights by invidious discrimination and/or viewpoint discrimination, courts have developed the doctrine of selective enforcement. *Gardenhire v. Schubert*, 205 F.3d 303, 318–19 (6th Cir.2000); *Occupy Nashville v. Haslam*, 949 F.Supp.2d 777 (M.D. Tenn. 2013). Notwithstanding the Government's broad discretion to enforce criminal laws, "[a] defendant may demonstrate that the administration of a criminal law is 'directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive' that the system of

5

prosecution amounts to 'a practical denial' of equal protection of the law." *United States v. Armstrong*, 517 U.S. at 464–65 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886)).

The Sixth Circuit has differentiated between two types of selective prosecution claims: (1) those brought by members of a protected class alleging the government arbitrarily discriminated against them based on class membership, and (2) those brought by individuals who claim they were punished for exercising a constitutionally protected right. *Futernick v. Sumpter Twp.*, 78 F.3d 1051, 1056 (6th Cir. 1996). The first type, the Sixth Circuit identified as "selective prosecution," the second type as "vindictive prosecution." *Futernick*, 78 F.3d at 1056 n.7. The Sixth Circuit has also developed a three-part test to analyze selective prosecution claims:

> "First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to."

*Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000) (quoting *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir.1991)). *See also Cunningham v. Sisk*, No. 03-6640 (6ᵗʰ Cir. 2005) (same). In contrast to a vindictive prosecution claim, in which a defendant asserts that "'the prosecutor has brought the charge for reasons forbidden by the Constitution,' *Armstrong*, 517 U.S. at 463, a selective enforcement claim is directed at the 'actions of law enforcement and those affiliated with law-enforcement personnel.'" *United States v. Mills*, 389 F. Supp. 3d 520, 523–24 (E.D. Mich. 2019) (quoting *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017), *cert. denied*, ⸺ U.S. ⸺, 138 S. Ct. 713 (2018)).

"Selective enforcement claims are judged according to ordinary Equal Protection standards," *Gardenhire v. Schubert*, 205 F.3d at 318, while viewpoint discrimination is "a violation of the First Amendment." *L.D. Mgmt. Co. v. Thomas*, 456 F. Supp. 3d 873, 878 (W.D.

Ky. 2020), aff'd sub nom. *L.D. Mgmt. Co. v. Gray*, 988 F.3d 836 (6th Cir. 2021). "Although there can be overlap between a 'viewpoint discrimination' claim under the First Amendment and a 'selective enforcement' claim under the Equal Protection Clause of the Fourteenth Amendment" (or the Fifth Amendment), they are distinct violations. *Berg v. Village of Scarsdale*, No. 20-4130, 2021 WL 5751385, at *3 (2d. Cir. 2021). The selective enforcement in this case should be evaluated under both an equal protection analysis and a First Amendment analysis.

To dismiss for selective prosecution under an equal protection analysis, a defendant must adduce "'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468 (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974))." An equal protection violation may be established by direct evidence, inferences drawn from indirect evidence, valid relevant statistical evidence, or other circumstantial evidence. *Bey v. Falk*, 946 F.3d 304, 319 (6th Cir. 2019) (citing *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997)). *See also Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 571 (6th Cir. 2011) ("Direct or circumstantial evidence ... may establish an Equal Protection Clause violation."); *United States v. Saucedo*, 226 F.3d 782, 790 (6th Cir. 2000) (noting that a plaintiff could prove "by requisite direct, circumstantial, or statistical evidence, that he was a target of racial profiling"). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts ..." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

**B. The Government's Procedural Improprieties Demonstrate Selective Enforcement.**

In the instant case, Defendants readily satisfy the requirement of showing similarly situated individuals not being prosecuted. First, the FACE Act prohibits not only interference with an individual's seeking or providing reproductive health services, but also the intentional damaging of a facility providing reproductive health services or a place of religious worship. 18 U.S.C. § 248(a)(3).[3] Pregnancy resource centers constitute facilities providing reproductive health services under the Act. *Id.*; *see also Norton v. Ashcroft*, 298 F.3d 547, 553 (6th Cir. 2002) ("Thus, the Act prohibits interference with not only abortion-related services, it also prohibits interference with counseling regarding abortion alternatives.") (citation omitted). The FACE Act as written "does not play favorites" as it should protect both "abortion clinics" and "facilities providing pre-pregnancy counseling services". *Terry v. Reno*, 101 F.3d 1412, 1419 (D.C. Cir. 1996). *See also Riely v. Reno*, 860 F. Supp. 693, 702 (D. Ariz. 1994) (FACE "would apply to an

---

[3] The Indictment alleges a violation of Section 248 (a)(1). The protection of facilities is contained in subsection (a)(3). Subsection (a) provides in full:

    -Whoever-

    (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services;

    (2) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship; or

    (3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services, or intentionally damages or destroys the property of a place of religious worship, shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor.

18 U.S.C. § 248(a).

individual who spray paints the words 'KEEP ABORTION LEGAL' on a facility providing counseling regarding abortion alternatives").

By a clearly observable pattern, the Government has refused to prosecute almost *any* of the more than 170 incidents of violence against pro-life pregnancy centers and churches nationwide in the wake of the leak and publishing of *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022).[4] According to FBI Director Christopher Wray's testimony before Congress, since the Supreme Court's *Dobbs* decision, the DOJ has indicted only two pro-abortion activists out of at least 81 estimated attacks against pro-live groups (not including churches).[5] All the while, the DOJ has engaged in a course of aggressively using FACE along with other federal statutes to prosecute peaceful acts of speech and alleged acts of nonviolent civil disobedience by persons advocating a pro-life and anti-abortion positions, while simultaneously turning a blind eye to brazen and repeated violent attacks on churches and pregnancy resource centers committed by pro-abortion activists. In a DOJ Report entitled, "Recent Cases on Violence Against Reproductive Health Care Providers," DOJ's own reporting shows that DOJ has initiated eleven criminal prosecutions against pro-life defendants since 2020, but not a single one against a pro-abortion defendant.[6]

Moreover, since the *Dobbs* decision was announced, the Government has arrested and aggressively prosecuted nonviolent pro-life advocates like Defendants, whereas prior to the

---

[4] Mary Margaret Olohan, "DOJ's Kristen Clarke: A Pro-Abortion Activist Enforcing the Law Against Pro-Lifers," The Daily Signal, Oct. 26, 2022, https://www.dailysignal.com/2022/10/26/dojs-kristen-clarke-pro-abortion-activist-enforcing-law-pro-lifers/; *see* Fed. R. Evid. 201(b)(2) (courts may take judicial notice of facts that are "not subject to reasonable dispute" because they can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned") (hereafter "Olohan").

[5] https://www.foxnews.com/politics/pro-life-centers-targeted-70-abortion-related-violent-threats-dobbs-decision-fbi.

[6] Hereinafter "DOJ Recent Cases" accessible at https://www.justice.gov/crt/recent-cases-violence-against-reproductive-health-care-providers.

*Dobbs* decision in June 2022 the only FACE prosecutions the Government filed involved violent or threatening activity. *See* DOJ Recent Cases, *supra*. While the conduct of which Defendants are accused may have caused slight discomfort or annoyed Patient A and facility employees, it was not physical nor did it involve threats or violence of any kind. Yet Defendants face harsher penalties than that faced by almost all of the defendants in the cases filed before *Dobbs*, even though some of them involved bomb threats, threats of physical violence, firebombing of abortion facilities, and shootings. *Id*.

The Government's practice of prosecuting pro-life conduct while favoring pro-abortion conduct (by not prosecuting) is not content-neutral. It is the epitome of a content-based selective enforcement based on viewpoint discrimination. Accordingly, the Government's refusal to apply FACE to pro-abortion activists like Jane's Revenge[7], while simultaneously and aggressively applying it to pro-life individuals like these Defendants (who were apparently targeted by the Government in retaliation for the *Dobbs* decision — as well as some fifteen others in 2022 and another eight so far this year[8]— is unconstitutionally selective and viewpoint discriminatory.

Not coincidentally, the relentless attacks on pregnancy resource centers since the Supreme Court's decision in *Dobbs* on June 24, 2022 corresponds with the Administration's

---

[7] Luke Vander Ploeg and Addison Lathers, "Anti-Abortion Group in Wisconsin Is Hit by Arson, Authorities Say," *New York Times*, May 8, 2022, https://www.nytimes.com/2022/05/08/us/madison-anti-abortion-center-vandalized.html; Alice Reid, "Report: Group claims credit for Madison anti-abortion office attack, warns of more," NBC 26, May 11, 2022, https://www.nbc26.com/news/state/report-group-claims-credit-for-madison-anti-abortion-office-attack-warns-of-more; Judith Levine, "Beyond Revenge, What Does Jane's Revenge Want?," Intercept, June 16, 2022, https://theintercept.com/2022/06/16/janes-revenge-abortion-rights/ (Jane's Revenge claiming responsibility for acts of vandalism and fire-bombings of pro-life clinics and offices).

[8] Olohan, *supra*; *see also* Inside Edition Staff, "8 People Indicted for Blocking Michigan Reproductive Health Services Facility That Provides Abortions: DOJ," Inside Edition, February 23, 2023, https://www.insideedition.com/8-people-indicted-for-blocking-michigan-reproductive-health-services-facility-that-provides-79945.

formalizing the formation of the Reproductive Rights Task Force less than three weeks later, on July 12, 2022, with the express purpose of continuing its efforts to "identify ways to protect access to reproductive health care in anticipation of the possibility of the Supreme Court overturning *Roe v. Wade* and *Planned Parenthood v. Casey*." DOJ Press Release dated July 12, 2022, "Justice Department Announces Reproductive Rights Task Force," https://www.justice.gov/opa/pr/justice-department-announces-reproductive-rights-task-force.

The press release further stated that the Justice Department was "working with external stakeholders such as reproductive services providers" – that is, coordinating with abortion facilities – and would "identify such actions and coordinate appropriate federal government responses, including proactive and defensive legal action where appropriate." *Id*. In short, the Government admits that it has singled out individuals like Defendants for "proactive legal action" due solely to their opposition to abortion, even though the events giving rise to the prosecution occurred two years ago and were entirely of a non-violent nature, as opposed to the other pre-*Dobbs* FACE prosecutions.

Despite the numerous and ongoing incidents of violent actions against pregnancy resource centers, no task force protecting pro-life facilities has been formed; virtually no prosecutions have been commenced; and, upon information and belief, almost no serious investigation has been undertaken, even though the fire bombings and vandalism of pregnancy resource centers are prohibited by the very same law under which Defendants are being prosecuted. After so long a time and mounting criticism, the DOJ finally indicted two individuals under FACE for attacking pregnancy resource centers only weeks ago.[9]

---

[9] U.S.D.O.J., Office of Public Affairs, "Two Defendants Indicted for Civil Rights Conspiracy and FACE Act Offenses Targeting Pregnancy Resource Centers," January 24, 2023,

This marked discrepancy between the aggressive enforcement of FACE against peaceful pro-life advocates and the utter lack of enforcement against violent pro-abortion activists should not be surprising, given the bias of the Justice Department official in charge of the investigations. "Kristen Clarke, assistant attorney general for civil rights at the Department of Justice, is a vocal abortion proponent who has repeatedly expressed her support for preserving *Roe v. Wade*." Olohan, *supra*. Ms. Clarke oversees these investigations. She has made no secret of her disdain for pregnancy resource centers, publicly smearing them as "predatory" and "fake clinics." *Id.* She has a long history of zealous support for abortion and abortion facilities, having led the National Task Force on Violence Against Reproductive Health Care Providers since its inception in 1998 until her confirmation. *Id.*

Both discriminatory selection and discriminatory purpose are thus established here. Further, the discriminatory effect is plain to see – the Government's in terrorem arrests, using a wholly unnecessary FBI swat team, only add to the effect of dissuading Defendants and all pro-life activists from exercising their First Amendment rights outside abortion facilities in the future. *See*, *e.g.*, Mia Cathell, "EXCLUSIVE VIDEO: Armed FBI Agents Arrest Pro-Life Leader in Front of His Children," Townhall.com October 7, 2022, https://townhall.com/tipsheet/miacathell/2022/10/07/pro-life-leader-paul-vaughn-fbi-raid-n2614138.

### C. The Government's Pattern of Enforcement Against Only Pro-Life Individuals, and Not Pro-Abortion Individuals, Violates the First Amendment.

The First Amendment prohibits "viewpoint discriminatory enforcement" where the Government has engaged in "a pattern of unlawful favoritism." *Brown v. City of Pittsburgh*, 586

---

https://www.justice.gov/opa/pr/two-defendants-indicted-civil-rights-conspiracy-and-face-act-offenses-targeting-pregnancy-0.

F.3d 263, 293 (3d Cir. 2009) (quoting *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002)); *see also Gaughan v. City of Cleveland, Ohio*, No. 1:05-CV-180, 2005 WL 3216269, at *13 (N.D. Ohio Nov. 29, 2005), aff'd sub nom. *Gaughan v. City of Cleveland*, 212 F. App'x 405 (6th Cir. 2007) (analyzing both selective enforcement and viewpoint discriminatory enforcement claims). An as-applied challenge requires the Court to determine whether the statute as applied to the facts of the case violates the First Amendment. *Singer v. United States,* 38 F.3d 1216 (6th Cir. 1994). To prevail, a defendant must show that "enforcement of the [law] has tended to fall more heavily on those who advocate one viewpoint (e.g., a pro-life view) than on those who advocate another (e.g., a pro-choice view)," and an "intent to discriminate on the basis of viewpoint." *Brown*, 586 F.3d at 293. In other words, the defendant prevails where "a pattern of enforcement activity *evinc[es]* . . . intentional discrimination on the basis of viewpoint." *Brown*, 586 F.3d at 294 (emphasis added).

There is overwhelming evidence of exactly this sort of pattern here. As noted, FACE protects both pro-choice and pro-life "reproductive health services." Yet the indisputable evidence shows that under Kristen Clarke's leadership the Department of Justice has engaged in a pattern of aggressive enforcement of FACE against nonviolent pro-life individuals who have been federally indicted for conduct that occurred years before the *Dobbs* decision – the timing of these prosecutions underscores the viewpoint discrimination perpetrated by the Government. Simultaneously, the Government has turned while turning a blind eye to blatant and violent violations by pro-abortion individuals—even when pregnancy centers and churches have been *firebombed* and vandalized at far greater rates in the past year, *including in Nashville*, expressly

because they promote abortion alternatives.[10] Indeed, activists threw a Molotov cocktail through the window of Hope Clinic for Women, a pregnancy resource center, in midtown Nashville on June 30, 2022, less than a week after the *Dobbs* decision was announced. The message "Jane's Revenge," "an abortion rights group that has claimed responsibility for recent acts of firebombing and vandalism at crisis pregnancy centers in the wake of the leaked Supreme Court decision," was spray-painted on the side of the building.

In 2022 alone, the Government engaged in seven enforcements of the FACE Act against a total of 26 individuals—all of whom are pro-life activists.[11] This number is significantly higher than FACE prosecutions in recent years, which included only four individuals in 2021, one in 2020, two in 2019, one in 2018, and nine total between 2011 and 2017.[12] Glaringly, the Government has thus far enforced FACE against only two individuals for the ongoing attacks against no less than *98 Catholic churches* and *81 pregnancy resource centers* just since the May 2022 leak of the draft opinion in *Dobbs*.[13] This attack, and *more than one hundred seventy like it* around the country since May 2022, plainly violate the express terms of FACE. *See Riely*, 860 F. Supp. at 702. Yet the Government has prosecuted only two of these outrageous acts of violence to date. As one pro-abortion writer objecting to the use of the FACE Act to prosecute anyone other than pro-life advocates observed, FACE "was not written in response to acts like" those

---

[10] Molly Davis and Kirsten Fiscus, "Molotov cocktail thrown through window at Nashville pregnancy resource center Thursday," The Tennessean, June 30, 2022, https://www.tennessean.com/story/news/crime/2022/06/30/nashville-pregnancy-centermolotov-cocktail-breaks-window-janes-revenge-abortion/7780855001/.

[11] Olohan, *supra* n.1; See also DOJ Recent Cases. Notably, several of the Defendants in this case were indicted earlier this month in Michigan for conduct that predates the acts alleged in the above referenced Indictment.

[12] DOJ, Recent Cases, *supra.*

[13] Olohan, *supra* n.1; *see also* Catholic Vote, *Tracking Attacks on Pregnancy Centers & Pro-Life Groups*, last updated Dec. 2, 2022, https://catholicvote.org/pregnancy-center-attack-tracker/; Catholic Vote, *Tracker: Over 240 Attacks on U.S. Catholic Churches Since May 2020*, https://catholicvote.org/tracker-church-attacks/.

against pregnancy resource centers that formed the basis of indictment, and "[i]n its 30 years on the books, it has been used sparingly. Until recently, the roughly 100 cases filed were all against people who" were pro-life.[14] Indeed. there is on average more than one attack on churches or pro-life groups *every other day* for the past nine months, yet the DOJ has largely ignored them and concentrated instead on non-violent incidents that occurred almost two years ago involving pro-life advocates.

While the FBI has recently claimed it is investigating at least some of these attacks, it has refused to say whether it is investigating them as violations of the FACE Act; and DOJ has not said whether the FBI has referred *any* of these cases for prosecution.[15] Further, as two Congressman recently pointed out in a letter of inquiry to DOJ, there is no evidence of any similar over-the-top FBI raids with long guns against pro-abortion violators, even though Mr. Vaughn was made to suffer exactly such treatment for his conduct that occurred over two years ago.[16]

In short, this is precisely the kind of "pattern of unlawful favoritism" that "evince[es] . . . intentional discrimination on the basis of viewpoint." *Brown*, 586 F.3d at 293-94; *see also Thomas v. Chi. Park Dist*., 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers . . . would of course be unconstitutional."). Beyond question, the Government's recent enforcement of the FACE Act has fallen far "more heavily on those who advocate . . . a pro-life view," even

---

[14] Natasha Lennard, "Reproductive Rights Activists Charged Under Law Intended to Protect Abortion Clinics," The Intercept, February 3, 2023, https://theintercept.com/2023/02/03/abortion-clinics-face-act/.

[15] Olohan, *supra*.

[16] Mia Cathell, "Armed FBI Agents Arrest Pro-Life Leader," *supra*; *see also*, Mary Margaret Olohan, "EXCLUSIVE: Jim Jordan Launches Congressional Inquiry Into FBI Raid on Mark Houck, DOJ's Political Enforcement of FACE Act," Daily Signal, Oct. 7, 2022. https://www.dailysignal.com/2022/10/07/exclusive-jim-jordan-launches-congressional-inquiry-into-fbi-raid-on-mark-houck-dojs-political-enforcement-of-face-act/.

though the indisputable evidence confirms that "advocates of a [pro-life] viewpoint" do *not* "happen to engage in certain proscribed conduct more than those who espouse other views." *Id.* If anything, the evidence shows that those with a pro-abortion viewpoint engage in ostensible FACE Act violations far more often than do those with a pro-life viewpoint. This easily "evinces" both disparate impact *and* intentional discrimination in violation of the First Amendment. It is also easily distinguished from cases where defendants or claimants pointed to no actual "evidence that the police turned a blind eye toward pro-abortion speech while not turning a blind eye to possible transgressions by plaintiffs." *McGuire*, 386 F.3d at 65.

This evidence also fits well within the *Village of Arlington Heights* factors that courts often find "probative in determining discriminatory intent." *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)). Specifically, it shows a "consistent pattern" that "disparately impact[s] members of a particular class of persons," as well as "significant departures from normal procedures." *Id.* Indeed, one former high-ranking DOJ official recently stated (anonymously) that the prosecution of pro-life advocates like Mark Houck, Mr. Vaughn, and the other Defendants here are "atypical" from previously FACE Act prosecutions, which usually "involve things like blowing up an abortion clinic, or threatening to blow up a clinic, serious violence or threats to bodily injury," not "something of th[e] nature that is alleged in the Houck case."[17] And in a letter of inquiry to the FBI, twelve (12) Senators recently noted that the unusually aggressive nature of Mr. Houck's arrest appeared to violate DOJ's own use-of-force

---

[17] Olohan, *supra* n.1.

policy.[18] The same excessive use of force was employed against Mr. Vaughn in effectuating his arrest as was employed against Mr. Houck (who, incidentally, was found not guilty after a full trial).

Finally, on July 8, 2022, as part of an overall response to *Dobbs*, President Biden declared that "I'm asking the Justice Department . . . to do . . . everything in their power to protect these women seeking to invoke their right" to abortion; and "[i]n states where clinics are still open, to protect them from intimidation."[19] These sorts of "contemporaneous statements" by relevant decisionmakers like President Biden, especially while failing to take any official action in response to the phenomenon of nationwide and rampant pro-abortion violence against pregnancy centers and churches since the *Dobbs* leak, are only more evidence of discriminatory intent.[20] It is also noteworthy that after *Dobbs* there is no federal "right" to abortion, while the First Amendment rights of free speech, free exercise of religion, and freedom of assembly – which should protect Defendants -- remain as viable as ever.

The Indictment should be dismissed for selective prosecution.

---

[18] Brianna Herlihy, "12 GOP senators demand explanation for FBI arrest of pro-life activist," Fox News, Sept. 28, 2022, https://www.foxnews.com/politics/12-gop-senators-demand-explanation-fbi-arrest-pro-life-activist.

[19] The White House, "Remarks by President Biden on Protecting Access to Reproductive Health Care Services," July 8, 2022, https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/08/remarks-by-president-biden-on-protecting-access-to-reproductive-health-care-services/.

[20] In addition to Mr. Biden's viewpoint discrimination, Ms. Clarke's verbal assaults against pro-life advocates must not be overlooked. She has claimed that the "anti-choice movement [that] will stop at nothing." Olohan, *supra* n.1; *see also* Chuck Ross, "Pro-Life Facilities Are Under Attack. A Top DOJ Official Called Them 'Fake Clinics.'," The Washington Free Beacon, June 15, 2022, https://freebeacon.com/biden-administration/pro-life-facilities-are-under-attack-a-top-doj-official-called-them-fake-clinics/. While these statements are not immediately contemporaneous, they are still probative in discerning the discriminatory nature of the Government's one-sided enforcement of the FACE Act.

## II. FACE WAS ENACTED FOR THE PURPOSE OF PROTECTING THE SO-CALLED RIGHT TO ABORTION; AFTER *DOBBS*, THERE IS NO FEDERAL RIGHT TO ABORTION; THEREFORE, FACE IS UNCONSTITUTIONAL.

FACE was originally enacted for the purpose of protecting abortion and access to abortion. The findings supporting the need for the Act and the entire legislative history were thus focused on abortion. When the Supreme Court handed down its decision in *Dobbs v. Jackson Women's Health Organization*[21] the constitutional "right" to abortion ceased to exist, and the very reason for FACE, its essence, its foundation, was destroyed. As a result, FACE is unconstitutional.

### A. The legislative history proves that FACE was enacted only to protect abortion.

As introduced by Senator Kennedy on March 23, 1993, FACE was explicit in its purpose of protecting abortion and abortion alone. Senate Bill 636 recited that it was introduced in response to the Supreme Court's decision only two months earlier in the case of *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), which held that pro-life activists could not be held liable under 42 U.S.C. § 1985(3), the civil counterpart to 18 U.S.C. § 241, for their actions in trespassing and obstructing access to abortion facilities. In *Bray*, the plaintiff abortion facilities had originally succeeded in obtaining a permanent injunction against Operation Rescue and certain individuals for "conspiring to deprive women seeking abortions of their right to interstate travel" and enjoining them "from trespassing on, or obstructing access to, abortion clinics in specified Virginia counties and cities in the Washington, D.C., metropolitan area." 506 U.S. 263, 267.[22]

In Section 2 of the bill, Statement of Findings and Purpose, for example, it recited:

---

[21] 142 S. Ct. 2228 (June 24, 2022).
[22] This activity, of course, is the very same activity of which Defendants stand accused here.

(a) Findings. -- Congress finds that—

(1) medical clinics and other facilities **offering abortion services** have been targeted in recent years by an interstate campaign of violence and obstruction aimed at closing the facilities or physically blocking ingress to them, and intimidating **those seeking to obtain or provide abortion services**;

\*     \*     \*

(8) in the *Bray* decision, the Court denied a remedy under such section to persons injured **by the obstruction of access to abortion services**;

(9) **legislation is necessary to prohibit the obstruction of access by women to abortion services** and to ensure that persons injured by such conduct, as well as the Attorney General, can seek redress in the Federal courts;

(10) **the obstruction of access to abortion services can be prohibited**, and the right of injured parties to seek redress in the courts can be established, without abridging the exercise of any rights guaranteed under the First Amendment to the Constitution or other law; and . . .

Senate Bill 636 -- Freedom of Access to Clinic Entrances Act of 1994, 103rd Congress (1993-1994), https://www.congress.gov/bill/103rd-congress/senate-bill/636/text/is?r=29.

The purpose of the Act was also explicitly stated:

(b) Purpose. -- It is the purpose of this Act to protect and promote the public health and safety by prohibiting the use of force, threat of force or physical obstruction to injure, intimidate or interfere with **a person seeking to obtain or provide abortion services**, and the destruction **of property of facilities providing abortion services**, and by establishing the right of private parties injured by such conduct, as well as the Attorney General in appropriate cases, to bring actions for appropriate relief.

*Id*. at Sec. 2(b) (emphasis added). Similarly, the operative section setting forth the prohibited conduct (which eventually became Sec. 248(a)(1) and (2)) explicitly referred to abortion:

``(a) Prohibited Activities.--Whoever—

``(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes

19

with or attempts to injure, intimidate or interfere with any
person because that person is or has been, or in order to
intimidate such person or any other person or any class of
persons, from--
> ``(A) **obtaining abortion services**; or
> ``(B) lawfully aiding another person **to obtain**
>   **abortion services**; or
``(2) intentionally damages or destroys the property of a
medical facility or in which a medical facility is located, or
attempts to do so, **because such facility provides abortion**
**services**,
shall be subject to the penalties provided in subsection (b) and the
civil remedy provided in subsection (e).

*Id*. at Sec. 3 (emphasis added).

As reported out of the Senate Committee on Labor and Human Resources on July 29, 1993, the language referring to "abortion" or "abortion services" was modified to "abortion-related services." S. REP. 103-117, 50 (1993).[23] Eventually, of course, "abortion-related services" became "reproductive health services" in the final version. That these explicit references to abortion and abortion services were later softened to refer to "reproductive health services" does not change the fact that the underlying purpose of the Act was from its inception to protect abortion.

---

[23] In Section IV., entitled "NEED FOR THE LEGISLATION," the Report explains:

A nationwide campaign of **anti-abortion blockades**, invasions, vandalism and outright violence is **barring access to facilities that provide abortion services** and endangering the lives and well-being of the health care providers who work there and the patients who seek their services. **This conduct is interfering with the exercise of the constitutional right of a woman to choose to terminate her pregnancy**, and threatens to exacerbate an already severe shortage **of qualified providers available to perform safe and legal abortions** in this country.

S. REP. 103-117, 3 (emphasis added). It is therefore incontestable that FACE was enacted to protect access to abortion.

**B. *Dobbs* eviscerated the so-called federal right to abortion.**

In *Dobbs*, the Supreme Court overruled *Roe v. Wade*[24] and *In Planned Parenthood of Southeastern Pa. v. Casey*[25] and declared that there is no federal right to abortion. "We hold that *Roe* and *Casey* must be overruled. The Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision, including the one on which the defenders of *Roe* and *Casey* now chiefly rely—the Due Process Clause of the Fourteenth Amendment." 142 S. Ct. 2228, 2242. The Court exhaustively analyzed "the critical question whether the Constitution, properly understood, confers a right to obtain an abortion" – a question that *Roe* and *Casey* "skipp[ed] over." *Id*. at 2244. It also considered whether the doctrine of *stare decisis* required continued acceptance of the judicially-created "right." The Court found that "*Roe* was egregiously wrong from the start," *id*. at 2243, and that *Casey*, although reaffirming *Roe's* central holding, "revised the textual basis for the abortion right, silently abandoned *Roe's* erroneous historical narrative, and jettisoned the trimester framework." *Id*. at 2266. The majority, finding no support for the right to abortion in the text of the Constitution or in our nation's history, concluded simply: "We therefore hold that the Constitution does not confer a right to abortion. *Roe* and *Casey* must be overruled, and the authority to regulate abortion must be returned to the people and their elected representatives." *Id.* at 2279.

The creation of a constitutional right to abortion *ex nihilo* was specifically addressed by Justice Thomas in concurrence:

> In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court divined a right to abortion because it "fe[lt]" that "the Fourteenth Amendment's concept of personal liberty" included a "right of privacy" that "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id*., at 153, 93 S.Ct. 705. In *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S.

---

[24] 410 U.S. 113 (1973).
[25] 505 U.S. 833 (1992).

> 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Court likewise identified an
> abortion guarantee in "the liberty protected by the Fourteenth Amendment," but,
> rather than a "right of privacy," it invoked an ethereal "right to define one's own
> concept of existence, of meaning, of the universe, and of the mystery of human
> life." *Id*., at 851, 112 S.Ct. 2791.

*Dobbs*, 142 S. Ct. 2228, 2302 (Thomas, J., concurring). Justice Thomas then noted that

proponents of abortion continued to change their view as to the source of the purported right to

abortion, and counseled: "That 50 years have passed since *Roe* and abortion advocates still

cannot coherently articulate the right (or rights) at stake proves the obvious: The right to abortion

is ultimately a policy goal in desperate search of a constitutional justification." *Id*. at 2303.

Whatever the virtues (or vices) of abortion as a policy goal, once thing is clear after

*Dobbs* – there is no federal constitutional right to abortion, and the very reason for FACE's

existence no longer exists. As a result, FACE has not only lost its purpose, it has also lost its

constitutional validity.

## III. THE FACE ACT IS AN UNCONSTITUTIONAL CONTENT-BASED REGULATION OF SPEECH.

The FACE Act is facially unconstitutional because it discriminates against expressive

activity based on content and/or viewpoint. The Indictment should be dismissed for this reason

as well.

It is well settled that the protection of the First Amendment "does not end at the spoken

or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Conduct, too, "may be

sufficiently imbued with elements of communication to fall within the scope" of the First

Amendment." *Id*. (cleaned up). The High Court "has repeatedly stated, these rights are not

confined to verbal expression. They embrace appropriate types of action . . ." *Brown v.*

*Louisiana*, 383 U.S. 131, 141—142 (1966). Hence, the Supreme Court has

recognized the expressive nature of students' wearing of black armbands to protest American military involvement in Vietnam, *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 505, 89 S.Ct. 733, 735, 21 L.Ed.2d 731 (1969); of a sit-in by blacks in a "whites only" area to protest segregation, *Brown v. Louisiana*, 383 U.S. 131, 141–142, 86 S.Ct. 719, 723–24, 15 L.Ed.2d 637 (1966); of the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam, *Schacht v. United States*, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970); and of picketing about a wide variety of causes, *see, e.g.*, *Food Employees v. Logan Valley Plaza, Inc*., 391 U.S. 308, 313–314, 88 S.Ct. 1601, 1605–06, 20 L.Ed.2d 603 (1968); *United States v. Grace*, 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983).

*Id.*; *see also Speet v. Schuette*, 726 F.3d 867, 878 (6th Cir. 2013) (finding that "begging, or the soliciting of alms, is a form of solicitation that the First Amendment protects"); *Knight v. Montgomery Cnty., Tennessee*, 470 F. Supp. 3d 760, 767–68 (M.D. Tenn. 2020) (holding that plausible case exists for contention that "livestreaming qualifies as expressive conduct"). Consequently, "[t]he First Amendment generally prevents government from proscribing speech ... or even expressive conduct ... because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citations omitted).

Defendants were engaged in quintessential expressive conduct. Despite the Government going to great lengths to avoid mentioning it, the Indictment nonetheless recites that Coleman Boyd posted on his Facebook page: "Lord willing, our family will be doing a Face book live of some ministry activities tomorrow morning around 7:45 AM central time. Please be in prayer towards this. . . ." (DE 3, ¶ 13). As the Indictment states, the incident was live streamed by more than one participant. (*Id.*, *see also id. at* ¶¶ 14, 16, and 17). The Court may take judicial notice of the fact that Defendants read from the Bible, sang hymns, and prayed throughout the event. *See, e.g.*, Paul Sacca, "Biden's DOJ charges 11 pro-life activists for blocking Tennessee abortion clinic, some face hefty prison sentences," The Blaze, October 6, 2022, https://www.theblaze.com/news/tennessee-pro-life-activists-arrested-charged-doj-abortion (with

link to video of livestream of event)[26]. The Government specifically mentions Mr. Zastrow's acknowledging to Employee A that he was trespassing (Indictment, ¶ 20), but omits the fact that immediately afterward he said to Employee A, "Ma'am, we invite you to humble your heart and turn to the mercy of Jesus today." (Video at 2:05-2:13). Defendants' conduct, consisting not merely in a nonverbal sit-in but also prayer, Bible reading, hymn singing, and evangelistic outreach, is plainly protected by the First Amendment. The Government, however, took pains to charge Defendants with the harshest penalties it could find, apparently intent on expressing its disdain for the pro-life message.

"The First Amendment, . . . prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert, Ariz*., 576 U.S. 155, 163 (2015) (quoting U.S. Const., Amdt. 1). The Government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (citations omitted). If a restriction on speech is content based, strict scrutiny is applied, and the restriction "survives only if it is 'narrowly tailored to be the least-restrictive means available to serve a compelling government interest.'" *McGlone v. Metro. Gov't of Nashville*, 749 F. App'x 402, 405 (6th Cir. 2018) (quoting *Bible Believers v. Wayne Cty*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc)). And

---

[26] Fed. R. Evid. 201. "Judicial notice is appropriate if the fact 'is not subject to a reasonable dispute' because it is generally known or can be accurately and readily determined from reliable sources. Fed. R. Evid. 201(b)." *United States v. Taylor*, No. 621CR00013GFVTHAI, 2022 WL 11298155, at *4 (E.D. Ky. Oct. 18, 2022). This livestream video, specifically mentioned in the Indictment, is not subject to reasonable dispute. It is therefore appropriate for judicial notice.

it is the Government, not the Defendants, that carries the burden to prove narrow tailoring and a compelling government interest. *McGlone*, 749 F. App'x at 409.

> **A. *Reed* and *McCullen* changed the landscape on content neutrality.**

*Reed*, together with *McCullen v. Coakley*, 573 U.S. 464 (2014), clarified that a regulation of speech is facially and *objectively* content based when it defines "regulated speech by a particular subject matter," or, "more subtle[ly]," when it regulates speech based on "its function or purpose," even when there is no invidious intent. *Reed*, 576 U.S. at 163, 165-66. Further, a law is content based if enforcement authorities must "examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen*, 573 U.S. at 479.

> **B. FACE is content based.**

The FACE Act does not prohibit all interference with individuals near reproductive health care facilities, but only those who do so *because* that person is "obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1) (emphasis added). Accordingly, the Government must examine the content of Defendants' messages to determine their motivation before applying FACE. Such a determination renders the law content-based on its face under *McCullen* and *Reed*. Had the exact same actions that Defendants are alleged to have committed were undertaken not by pro-life advocates, but by, for example, a Black Lives Matter group upset with a White abortionist and an all-White staff, it would *not* violate FACE. Or again, a sit-in by a group of Martin Luther King, Jr. followers who object to the facility not treating African-Americans would not violate the Act, even though their conduct was *identical* to that of the Defendants. Their actions would not have been undertaken because the objects of their protest were "obtaining or providing reproductive health services," but because of their race.

The Senate was clear in its discussions and careful in its drafting to specifically *exclude* certain actors from the reach of FACE:

> Thus, for example, if an environmental group blocked passage to a hospital where abortions happen to be performed, but did so as part of a demonstration over harmful emissions produced by the facility, the demonstrators would not violate this Act (though their conduct might violate some other law, such as a local trespass law). In that example, **the demonstrators' motive** is related to the facility's emissions policy and practices and **not** to its policy and practices on abortion-related services. **The Committee has concluded that inclusion of the motive elements is important to ensure that the Act is precisely targeted at the conduct that**, as the Committee's record demonstrates, **requires new Federal legislation; deliberate efforts to interfere with the delivery of abortion-related services**.

S.Rep. No. 103-117, 103rd Cong., 1st Sess. 24 (1993) (emphasis added). Again, not all physical obstruction is prohibited under FACE; only that undertaken for purposes with which the Government disagrees, i.e., pro-life purposes. FACE is not content neutral.

The Sixth Circuit was therefore incorrect when it wrote that "the Act applies to anyone who violates its terms, regardless of ideology or message." *Norton v. Ashcroft*, 298 F.3d 547, 553 (6th Cir. 2002), *cert. denied*, 537 U.S. 1172 (2003) (citing *U.S. v. Weslin*, 156 F.3d 292 (2d Cir. 1998))[27]. One's "ideology or message" is an integral part of the calculus in determining whether FACE applies to the conduct to the extent it informs her motivation for "interfering with" a person seeking or providing "reproductive health services." To be fair, *Norton* was decided before the Supreme Court clarified the content neutrality analysis in *McCullen* and *Reed*. Indeed, all of the cases to address whether FACE was content-neutral were decided before *McCullen* and *Reed*. Like the Ninth Circuit's analysis in *Town of Gilbert v. Reed*, the Sixth

---

[27] *Weslin* committed the same error as *Norton*. The Second Circuit wrote that "FACE prohibits obstruction of reproductive health clinics regardless of the issue that animates the demonstrators." 156 F.3d at 297. As shown in the hypotheticals above, FACE does *not* prohibit *all* obstruction of reproductive health clinics, but only those motivated by the wrong purpose.

Circuit's analysis in *Norton* "skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face." *Reed*, 576 U.S. 155, 165 (2015).

The Sixth Circuit itself has reversed course and recalibrated its analysis post-*Reed* where a regulation of speech draws distinctions based on the content of the speech. In *Wagner v. City of Garfield Heights*, 675 F. App'x 599 (6th Cir. 2017), the court first held that a municipality's ordinance restricting the size of *political* signs but not other signs was content neutral and thus warranted only intermediate scrutiny, which the court found the city met. But after the Supreme Court's decision in *Reed* was handed down, the High Court reversed and remanded *Wagner*. On remand, the Sixth Circuit found the ordinance to be content based because the ordinance's requirement that law enforcement must examine the content of the speech to determine whether the ordinance applied was "determinative," not merely "indicative" of whether the restriction was content based. *Id.* at 604. To hold otherwise, the Sixth Circuit noted, "appears to run afoul of *Reed's* central teaching." *Id*. The court then applied strict scrutiny and held the ordinance was unconstitutional. *Id.* at 606-07.

The Ninth Circuit's opinion in *Reed* found that the laws before them were content-neutral because the government "'did not adopt its regulation of speech [based on] disagree[ment] with the message conveyed.'" *Reed*, 576 U.S. at 165 (quoting *Reed v. Town of Gilbert*, 587 F.3d 966, 1071-72 (9th Cir. 2009)). Similarly, *Norton* stated that [a] statute that regulates speech or conduct 'based on hostility—or favoritism—toward the underlying message expressed' is content-based." *Norton*, 298 F.3d at 552 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992)). This analysis is incorrect under *Reed*. As Judge Manion of the Seventh Circuit observed in analyzing *Reed*:

> *Ward* stated that "[t]he principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of

disagreement with the message it conveys." 491 U.S. at 791, 109 S.Ct. 2746. Over time, courts interpreted this statement to mean that it did not matter if a law regulated speakers based on what they said, so long as the regulation of speech was not imposed because of government disagreement with the message. Under this approach, if an ordinance was not viewpoint-based, then it was content-neutral. For example, a local government's decision to eliminate religious speech or abortion-related speech was considered content-neutral because it was not viewpoint-based—as, for instance, a regulation prohibiting "Christian speech" or "pro-life speech" was and remains. *Reed* eliminates this distinction. 135 S.Ct. at 2227 (concluding that a speech regulation is content-based if it prohibits the topic discussed or the idea or message expressed); *ante* at 412 ("*Reed* effectively abolishes any distinction between content regulation and subject-matter regulation."). On this point, *Reed* overrules *Ward*.

*Norton v. City of Springfield, Ill.*, 806 F.3d 411, 413 (7th Cir. 2015) (reconsidering ordinance after *Reed* and reversing itself to hold that ordinance was facially content-based, not content-neutral, under *Reed*) (Manion, J., concurring).

The Sixth Circuit in *Norton v. Ashcroft* adhered to the very same *Ward* formula as was overruled by *Reed*. Had *Norton* instead applied the analytical framework required by *Reed* it would have found FACE to be content based on its face, just as the sign ordinance was in *Town of Gilbert* and as was the ordinance at issue in the Seventh Circuit in *Norton v. City of Springfield*. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). "Although a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary." *Id.* (cleaned up).

A law is content based on its face if, as *Reed* counsels, it "target[s] speech based on its communicative content;" that is, it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163; *see also City of Austin, Texas v. Reagan*

28

*Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (same) [28]; *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, concurring in part, joined by Ginsburg, Sotomayor, and Kagan). Under *Reed*, FACE is content based on its face because it applies to particular speech – namely, pro-life speech – because of the message expressed. It prohibits pro-life sit-ins, but not race-based sit-ins. Nor does it prohibit a pro-abortion sit-in if, for example, an abortion facility's staff decided suddenly to cease doing abortions and a "Jane's Revenge" team came and blockaded the doors to protest the staff's decision.

### C. FACE fails strict scrutiny.

As a content-based regulation affecting speech, FACE must be subjected to strict scrutiny. That is, the restriction "survives only if it is narrowly tailored to be the least-restrictive means available to serve a compelling government interest.'" *McGlone v. Metro. Gov't of Nashville*, 749 F. App'x 402, 405 (6th Cir. 2018) (cleaned up). The standard is a difficult one; "we readily acknowledge that a law rarely survives such scrutiny. . .". *Burson v. Freeman*, 504 U.S. 191, 199-200 (1992). Here, the Government cannot show a *compelling* interest in preserving access to abortion-less "reproductive health services." After *Dobbs*, abortion can no longer be considered a part of "reproductive health care." All the evidence amassed to justify the enactment of FACE and to defend its constitutionality concerning women traveling interstate to obtain abortions because abortion facilities were not available in their state, or blockades by

---

[28]  *City of Austin* went on to distinguish laws which merely draw distinctions "only in service of drawing neutral, location-based lines" and are "agnostic as to content." *Id.* The distinctions FACE draws are emphatically message-driven and therefore content based, unlike the "location-based" distinctions in *City of Austin*.

"anti-abortion" activists, etc., may no longer be considered.[29] Gutted of its abortion rationale, FACE lacks a compelling interest, and the Act fails strict scrutiny.

Even assuming *arguendo* that the Government could demonstrate a compelling interest necessitating FACE after *Dobbs*, it would still fail strict scrutiny because it is not the least restrictive means of serving that interest. There are numerous less restrictive means available to secure the interest, for example, in protecting sidewalk access and public safety, as the Supreme Court instructed in *McCullen v. Coakley*, 573 U.S. 464 (2014), such as enforcing already existing criminal laws prohibiting trespass, blocking of the sidewalk, threats of force, and so forth, or securing narrowly tailored injunctions, etc. In fact, the actions of some of the Defendants were adequately addressed by local law enforcement and prosecution for violation of just such laws; FACE was entirely unnecessary here.

In addition, *McCullen* requires that even content-neutral regulations of speech in the public forum not overly burden speech and be narrowly tailored to serve a valid government interest. The Supreme Court struck down the state statute in *McCullen* even after finding it was content neutral, because it failed to meet the narrow tailoring requirements. *McCullen* announced a hard and fast rule: "To meet the requirement of narrow tailoring, the government must

---

[29] For example, the Sixth Circuit in *Norton* relied heavily upon the protection of abortion in upholding Congress' Commerce Clause authority to enact FACE:

> Express congressional findings underlying the Act plainly demonstrate that violent and obstructive acts directed at reproductive health facilities resulted in millions of dollars in damage, forced reproductive health clinics to close, delayed medical services, and intimidated numerous physicians from offering **abortion** services. S.Rep. No. 103–117, at 14 (1993); H.R.Rep. No. 101–306, at 7 (1993), reprinted in 1994 U.S.C.C.A.N, 699, 704. While the activity prohibited by the Act might be motivated by non-commercial sentiment—namely, **staunch moral opposition to abortion**—the effect of this activity is unambiguously and directly economic.

*Norton v. Ashcroft*, 298 F.3d 547, 556 (emphasis added).

demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." 573 U.S. at 495. The Government cannot satisfy this standard, either, once the abortion-protection rationale is removed from FACE. Indeed, protecting abortion was the *raison d'etre* for FACE; without it, FACE is nothing.

In short, FACE neither serves a compelling government interest nor employs the least restrictive means to serve any such interest. It therefore fails strict scrutiny and is unconstitutional on its face. The Indictment should be dismissed as content based.

## IV. THE GOVERNMENT'S INDICTMENT ALSO VIOLATES THE RELIGIOUS FREEDOM RESTORATION ACT AND THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT.

For similar reasons, given the discriminatory treatment of Defendants and their religious motivations for their conduct, the Indictment should be dismissed for violating the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA"), and the Free Exercise Clause of the First Amendment.

### A. FACE is unconstitutional as applied because it violates RFRA.

RFRA applies to "all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993," "unless," as to any law passed after that date, the "law explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb-39(a), (b). FACE was adopted in May 1994 but makes no reference to RFRA, *see* 18 U.S.C. § 248; FACE is thus subject to its rigorous requirements.

Under RFRA, the Government may not enforce even a facially neutral federal law in a manner that substantially burdens a person's religious exercise, unless the Government demonstrates that the burden is "the least restrictive means" of furthering a "compelling government interest" as applied. 42 U.S.C. § 2000bb-1(b)(1), (2). In other words, substantial

31

burdens on religious exercise must pass strict scrutiny—"the most demanding test known to constitutional law," which "will often be difficult" for the Government to satisfy. *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997).

It is undisputed that Defendants' pro-life praying, singing, Bible reading, and counseling is religiously motivated. Accordingly, application of FACE, which is of doubtful constitutionality after *Dobbs*, to the nonviolent religiously motivated actions of Defendants two years ago in a state where abortion is no longer legal, with its harsh prison terms and exorbitant fines—easily constitute a "substantial burden" under RFRA. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014).

The Government's prosecution of these Defendants must therefore satisfy strict scrutiny. But government action "cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993). And here, as noted, the Government has refused to prosecute the more than 150 nationwide incidents of damage and destruction inflicted on pregnancy centers and churches expressly protected by FACE. Thus, even assuming *arguendo* that some Defendants violated FACE (which they deny), the Government can "offer[] no compelling reason why it has a particular interest in denying an exception to [them] while making them available to others." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021).

Even if the Government had a compelling interest, the "least restrictive-means standard is exceptionally demanding," requiring it to show it lacks any "other means of achieving its desired goal." *Hobby Lobby*, 573 U.S. at 728. Here the evidence of any actual interference with abortion access is weak at best. The Indictment alleges that a single patient, Patient A, together with her

companion "walked into the crowded hallway **but stopped short of the Clinic entrance**." Indictment, DE 3, ¶ 19 (emphasis added). By the Government's own admission, then, the patient never even approached the entrance to the Clinic; she turned and left before she even got there. Under these circumstances, given that some of the pro-life advocates were speaking to her and urging her not to go through with the abortion (*id.*), it is at least as plausible to conclude that the patient changed her mind and voluntarily left the area. Reasonable doubt is thereby raised.

The only other evidence of interference mentioned in the Indictment is that Employee A was allegedly "unable to enter the Clinic" because Mr. Zastrow refused to move from the door. *Id.*, ¶ 20. But once again, the Government has carefully omitted salient facts. A review of the livestream video of the incident reveals that Employee A *first exited the Clinic* and then purported to be unable to get back inside. In other words, she appears to have intentionally created the crisis.

In any event, the local prosecution process is a manifestly less restrictive means.[30] FACE itself states that it does *not* provide "exclusive criminal penalties" nor "preempt State or local laws that may" penalize the conduct covered by FACE. 18 U.S.C. § 248(d)(3). Given Defendants' religious motivations and the arguable lack of actual interference with abortion access, the FACE-acknowledged local-prosecution process is plainly a less restrictive means of achieving the same interest. Thus, the Government's Indictment fails strict scrutiny and violates RFRA.

---

[30] And such local prosecution actually occurred here, as noted *supra*.

**B. FACE is unconstitutional as applied because it violates the Free Exercise Clause.**

While neutral laws of general applicability that burden religious exercise are presumptively valid, government action "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1878. Such laws must also undergo strict scrutiny.

Importantly, "de facto exemptions can demonstrate that a challenged [government action] is not generally applicable." *Soos v. Cuomo*, 470 F. Supp. 3d 268, 280 (N.D.N.Y. 2020). That is exactly the case here, given the Government's radically lopsided enforcement of FACE against Defendants' religiously motivated conductwhile thus far turning a blind eye to the nationwide violence against pregnancy resource centers and churches, often with the result of delaying or entirely shutting down their services.[31]

Therefore, the Government's blatant over- and underinclusivity—enforcing FACE against nonviolent pro-life individuals, while refusing to enforce it against violent pro-choice individuals who have stymied or effectively destroyed pro-life pregnancy centers, easily triggers strict scrutiny, which the Government fails for the reasons already discussed.

Accordingly, the Indictment should also be dismissed for violating RFRA and the Free Exercise Clause.

---

[31] *See, e.g.*, Nicole Ault, "The Attacks on Crisis-Pregnancy Centers," Wall Street Journal, June 20, 2022, https://www.wsj.com/articles/the-attacks-on-crisis-pregnancy-centers-janes-revenge-abortion-roe-v-wade-violence-destroyed-11655653644.

## V.     AFTER *DOBBS*, FACE EXCEEDS CONGRESS' POWERS UNDER THE COMMERCE CLAUSE, AND NO FEDERAL CIVIL RIGHTS INTEREST CAN SUPPORT FACE'S CONSTITUTIONALITY.

### A.  The Commerce Clause Does Not Provide Jurisdiction for This Prosecution.

After the Supreme Court decision in *Dobbs v. Jackson Women's Health Org.*, FACE is exposed as unconstitutional by virtue of the lack of Congressional authority to sustain it under the Commerce Clause. Unlike many other federal criminal statutes, FACE contains no express jurisdictional element—a factor that is often used to prevent statutes, and their application, from exceeding the powers granted to the federal government under the Commerce Clause. *See, e.g., United States v. Coleman*, 675 F.3d 615, 620 (6th Cir. 2012) ("we regard the presence of such a jurisdictional element as the touchstone of valid congressional use of its Commerce Clause powers to regulate non-commercial activity").

Article I, section 8, clause 3 of the U.S. Constitution grants Congress the power to regulate interstate commerce. This has been interpreted to reach three subjects of regulation: "the use of the channels of interstate commerce;" "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and "activities having a substantial relation to interstate commerce . . . *i.e.*, those activities that substantially affect interstate commerce[.]" *United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (internal citations omitted); *Norton v. Ashcroft*, 298 F.3d 547, 555 (6th Cir. 2002) (same).

"While this final category is broad, 'thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.'" *United States v. Morrison*, 529 U.S. 598, 613 (2000) (quoting *Lopez*, 514 U.S. at 559-60); *see also United States v. Lundy*, No. 3:15-CR-146, 2016 WL 5920229, at *4 (M.D. Tenn.

2016) (discussing *Morrison* and *Lopez* in context of Commerce Clause challenge to drug trafficking statute). It is beyond cavil that Defendants' conduct here, unlike drug trafficking, was purely intrastate noneconomic activity. And unlike the cultivation and use of marijuana at issue in *Gonzales v. Raich*, 545 U.S. 1 (2005), Defendants' conduct is not "part of an economic 'class of activities' that have a substantial effect on interstate commerce." 545 U.S. at 17.

The Sixth Circuit, following *Morrison*, looked to four considerations in considering the constitutionality of FACE before *Dobbs*: "1) the economic nature of the activity; 2) a jurisdictional element limiting the reach of the law to a discrete set of activities that has an explicit connection with, or effect on, interstate commerce; 3) express congressional findings regarding the regulated activity's effects on interstate commerce; and (4) the link between the regulated activity and interstate commerce." *Id.* at 555-56 (citing *Morrison*, 529 U.S. at 610–12). The court also considered significant the fact that several other circuit courts had also upheld the constitutionality of FACE. *Id.* at 556. The Sixth Circuit singled out the Third Circuit's analysis in *United States v. Gregg*, 226 F.3d 253 (3d Cir.2000), *cert. denied*, 532 U.S. 971 (2001) as particularly persuasive. *Id.*

**B. After *Dobbs*, abortion is no longer a proper consideration.**

The majority in *Gregg* determined, and the Sixth Circuit agreed, that although clinic blockades are not strictly economic it was "activity with an effect that is economic in nature" and that "economic activity can be understood in broad terms." *Id*. at 262. But this conclusion was reached only by considering the "violent and obstructive acts" that were [m]otivated by **anti-abortion sentiment**" and "intimidated a number of physicians from offering **abortion services**." *Id.* (citing S.Rep. No. 103–117, at 11; H.R.Rep. No. 103–306, at 9, U.S.C.C.A.N., at 706) (emphasis added). *Norton* likewise expressly acknowledged that it was abortion specifically, not

"reproductive health services" generally, that undergirded FACE: "Given the detailed congressional record, we are satisfied that Congress had a rational basis to conclude that the activities prohibited by the Act **disrupted the national market for abortion-related services** and decreased the availability of such services." 298 F.3d at 558 (emphasis added). Thus, after *Dobbs*, protection of access to abortion and "abortion-related services" is no longer a proper concern in federal law, and FACE cannot be sustained. *See*, *e.g.*, *U.S. v. McMillan*, 946 F.Supp. 1254, 1259 (S.D.Miss. 1995) ("Congress passed FACE **to enforce protection of both the substantive right of women to obtain abortion-related health services** and equal protection of the law where state officials are either unable or unwilling to provide that protection," summarizing position of the plaintiff U.S. Government); *U.S. v. Wilson*, 880 F.Supp. 621, 636 (E.D. Wis.), *rev'd*, 73 F.3d 675 (7th Cir. 1995) ("Finally, the Government argues that FACE is a valid exercise of **Congress' inherent power to pass laws that protect the exercise of fundamental rights, including the right to an abortion** recognized by the Supreme Court in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).") (emphasis added).

**C. Peaceful pro-life "protest" is not economic activity.**

The Gregg court found that "the misconduct regulated by FACE, although not motivated by commercial concerns, has an effect which is, at its essence, economic." 298 F.3d at 558. This line of reasoning is more suggestive of the logic of *Wickard v. Filburn*, 317 U.S. 111 (1942) than *U.S. v. Lopez*, 514 U.S. 549 (1995). It does what *Morrison* and *Lopez* said had never previously been done -- upholding Commerce Clause regulation of intrastate activity even though that activity is noneconomic in nature. *Gregg's* linguistic gymnastics, claiming economic activity should be understood "in broad terms," is nothing short of redefining paradigmatic noneconomic expressive conduct as economic activity. "[T]he notion that Congress can enact FACE because

the activities of protestors result in fewer abortions as well as less interstate movement of people and goods is really straining at gnats." *Hoffman v. Hunt*, 923 F.Supp. 791, 809 (W.D.N.C. 1996), *rev'd*, *Hoffman v. Hunt*, 126 F.3d 575 (4th Cir. 2003). "In fact, FACE is not aimed at the commercial activity of abortion facilities. It is aimed at the basic freedom of individuals to engage in civil protest." *Id*. Judge Weis, dissenting in *Gregg*, made the same point: "By its plain language, the statute is directed against the conduct of those external to a clinic's operations." *Gregg*, 226 F.3d at 269-70 (Weis, J., dissenting). "[A] protestor's conduct does not involve a purchase, sale, or any exchange of value in return for the rendering of a service, and cannot in any sense be deemed economic or commercial in character." *Id.* at 270.

      *Gregg* and *Norton* rely extensively on the interstate (or "national") market for abortion services to sustain the facial constitutionality of FACE and highlight the claimed shortage of "abortion-related services . . . that is exacerbated by the misconduct proscribed by FACE." 226 F.3d at 263-67. The fact that abortion facilities are involved in interstate commerce is also irrelevant; FACE does not regulate the facilities, but the pro-life advocates. Regardless, after *Dobbs*, consideration of the national market for abortion or the economic activity of abortion facilities is no longer material. And there is zero evidence to support any need for FACE with respect to "reproductive health services" other than abortion.

      As shown previously, the foundation of FACE, built entirely on the invalid premise that abortion is a constitutional right, has been decimated in the wake of *Dobbs*. Setting aside the questionable notion that a sit-in may somehow be construed as economic activity, the purported economic impact of "anti-abortion" activity can no longer be properly considered. "Anti-abortion" activity is, by definition, directed against abortions. Because FACE no longer protects

38

abortions, it can no longer be justified on the basis of anti-abortion activity undertaken decades ago.

As Judge Weis correctly observed in dissent in *Gregg*, any doubts about the applicability of *Lopez* outside its narrow facts "were dissipated by the expansive holding in" *Morrison*. 226 F.3d at 268 (Weis, J., dissenting). Judge Weis further noted the Supreme Court's statement in *Morrison* to the effect that "'[w]e accordingly reject the argument that Congress may regulate non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local.'" *Id.* (quoting *Morrison*, 529 U.S. at 617-18). If Congress cannot regulate noneconomic *violent* criminal conduct based solely on its aggregate effect on interstate commerce, then *a fortiori* it may not regulate noneconomic *nonviolent* conduct like that of Defendants on such a basis. Especially in the wake of *Dobbs* and the restoration of the right of states to regulate abortion, Judge Weis had the better argument in dissent when he wrote that "FACE, like the Gun–Free School Zones Act and the Violence Against Women Act, is an example of congressional intrusion into criminal law traditionally within the province of the States." 226 F.3d at 268-69. "'[N]either the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute[s] has an evident commercial nexus.'" *Id.* at 269 (quoting *Lopez*, 514 U.S. at 580 (Kennedy, J., concurring)). FACE was unconstitutional when it was enacted, and the fig leaf of a substantial relation to interstate commerce has now been completely removed by *Dobbs*.

**D. Post-*Norton* decisions of the Supreme Court make clear that Congress does not possess unfettered power to regulate simply by invoking a "market" for services.**

"[T]he Commerce Clause does not authorize Congress to 'regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.'" *United States v. Whited*, 311 F.3d 259, 266 (3d Cir. 2022) (quoting *Morrison*, 529 U.S. at 617). Ten years after the Sixth Circuit decided *Norton*, the Supreme Court made plain the insufficiency of an interstate "market" alone to support plenary federal regulation under the Commerce Clause of *any form* of intrastate conduct. In *NFIB v. Sebelius*, 567 U.S. 519 (2012), the Court held that an individual's decision to not purchase health insurance was beyond the regulation of Congress under the Commerce Clause. The Court reasoned that an individual's decision against purchasing health insurance is not economic activity, and moreover it could not be swept into the jurisdictional power of the federal government simply because there is, indisputably, a national market for healthcare. *See* 567 U.S. at 551-57.

**E. Principles of federalism militate against the constitutionality of FACE.**

Furthermore, when confronted with "an improbably broad reach" of a federal criminal statute, it is appropriate to seek recourse to principles of federalism, including a presumption against "interpreting the statute's expansive language in a way that intrudes on the police power of the States" to reach "purely local crimes," to properly interpret the law. *Bond v. United States*, 572 U.S. 844, 859-60 (2014) (internal citations omitted). While the federal government possesses only those powers expressly enumerated in the Constitution, "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," U.S. Const. amend. X. "As James Madison wrote, 'the powers delegated by the proposed Constitution to the federal government are few and defined. Those

which are to remain in the State governments are numerous and indefinite.'" *Lopez*, 514 U.S. at 552 (quoting The Federalist No. 45, pp. 292-93 (C. Rossiter ed. 1961)). This division between the powers of the federal and State governments is not a trifling technicality, but rather "was adopted by the Framers to ensure the protection of 'our fundamental liberties.'" *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985) (quoting *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 572 (1985) (Powell, J., dissenting)); *see Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) (describing "dual sovereignty").

One of the powers the federal government lacks that the states retain is a general police power. "For nearly two centuries it has been 'clear' that, lacking a police power, 'Congress cannot punish felonies generally' . . . A criminal act committed wholly within a State 'cannot be made an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States.'" *Bond*, 572 U.S. at 854 (internal citations omitted). Thus, it must be clear that Congress intended to reach crime of a local nature before a federal statute will be construed to criminalize such conduct. *Id.* at 860.

"[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance" regarding criminal law since "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States." *United States v. Bass*, 404 U.S. 336, 349 (1971). *See Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 169 F.3d 820, 841-42 (4th Cir. 1999) (describing most crimes as matters of traditional state concern) ("Congress not only has encroached upon the States' ability to determine when and how violent crime will be punished . . . but in so doing has blurred the boundary between federal and state responsibility for the deterrence and punishment of such

crime."). FACE was an affront to principles of federalism when enacted. Now, after *Dobbs*, it is flatly inconsistent with them.

Without a basis for the Court's exercise of federal jurisdiction, the Indictment should be dismissed.

**VI.  THE CONSPIRACY CHARGE SHOULD BE DISMISSED BECAUSE AFTER *DOBBS* THERE ARE NO CIVIL RIGHTS AT ISSUE. THE INTENT WAS TO SUPPRESS SPEECH, THE PENALTY IS GROSSLY DISPROPORTIONATE, AND IT IS CONTRARY TO CONGRESS' INTENT.**

The Government has charged seven Defendants, Paul Vaughn, Chet Gallagher, Heather Idoni, Calvin Zastrow, Coleman Boyd, Caroline Davis, and Dennis Green, with conspiracy "to injure, oppress, threaten, or intimidate" persons in the free exercise of their civil rights under 18 U.S.C. § 241. Indictment, Count 1. By this means, the Government has transformed a misdemeanor FACE violation into a serious felony conspiracy carrying a maximum sentence of ten (1) years and a fine of up to $250,000. Such an absurd result is the very definition of injustice and should not be countenanced by this Court.

In addition, as stated previously, this entire case was undertaken for an improper motive, as retaliation for the Supreme Court's overruling *Roe v. Wade* and *Planned Parenthood v. Casey* in the *Dobbs* case. Indeed, Associate Attorney General Vanita Gupta instructed the DOJ's Civil Rights Division that in the wake of *Dobbs* enforcement of FACE was urgent: "Earlier this year, in *Dobbs v. Jackson Women's Health Organization*, the Supreme Court dealt a devastating blow to women throughout the country, taking away the constitutional right to abortion and increasing the urgency of our work, **including enforcement of the FACE Act**, to ensure continued lawful access to reproductive services." DOJ Press Release, "Associate Attorney General Vanita Gupta Delivers Remarks at the Civil Rights Division's 65th Anniversary, December 6, 2022, https://www.justice.gov/opa/speech/associate-attorney-general-vanita-gupta-delivers-remarks-

civil-rights-divisions-65th (emphasis added) (hereinafter "Gupta"). The irony of this statement, made on the anniversary of the formation of DOJ's Civil Rights Division. urging protection of a non-existent constitutional right by means of crushing fundamental First Amendment rights such as those of Defendants, should not be overlooked.

In considering an as-applied constitutional challenge to Section 241, "[t]he relevant inquiry is whether the governmental interest in regulation is related to the suppression of free expression." *United States v. Lee*, 935 F.2d 952, 954 (8th Cir. 1991), *opinion vacated in part* (Aug. 14, 1991), *on reh'g in part*, 6 F.3d 1297 (8th Cir. 1993) (citing *Texas v. Johnson*, 491 U.S. 397, 403 (1989)). "If the interest is related to the suppression of expression, we must apply a heightened standard of review." *Id*. Here, the comments of Assistant Attorneys General Gupta and Clarke, the timing of these indictments against nonviolent pro-life advocates for alleged crimes that occurred years before, and the failure of DOJ to prosecute or perhaps even to investigate violent pro-abortion activists occurring to this very day all point strongly to the conclusion that the government interest in charging conspiracy is driven by the goal of suppressing free expression by pro-life advocates. Adding further fuel to the Government's fire to punish pro-lifers is Ms. Gupta's celebrating the Civil Rights Division's previous work between 1995-2000, when it "worked to combat religious discrimination and hate crimes through the National Church Arson Task Force." *See* Gupta, *supra*. The Court may take judicial notice of the absence of any Arson Task Force investigating the ongoing fire bombings of churches and pro-life pregnancy centers since *Dobbs* was announced.

The Eighth Circuit, on rehearing en banc in *United States v. Lee*, reversed a conviction under Section 241 on grounds of infringement of First Amendment rights. The court succinctly set forth the standard governing its analysis:

"Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc*., 468 U.S. 641, 648–49, 104 S.Ct. 3262, 3266–67, 82 L.Ed.2d 487 (1984). When a law is content-based, we must subject the state's interest "to 'the most exacting scrutiny.'" *Texas v. Johnson*, 491 U.S. 397, 411, 109 S.Ct. 2533, 2543, 105 L.Ed.2d 342 (1989) (quoting *Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988)). "'A law directed at the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need.'" *Johnson*, 491 U.S. at 406, 109 S.Ct. at 2540 (quoting *Community for Creative Non–Violence v. Watt*, 703 F.2d 586, 622–23 (D.C.Cir.1983) (en banc) (Scalia, J., dissenting), *rev'd sub nom. Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

*Lee*, 6 F.3d 1297, 1299–1300 (8th Cir. 1993). Applying this standard to the facts before it, the Eighth Circuit reversed the conviction of the defendant, who had been charged for burning a cross near an apartment building in which an African-American family lived, because application of Section 241 under the circumstances there was "not unrelated to the suppression of expression." *Id*. at 1301. In the same way. as applied against these Defendants and under these circumstances, applying Section 241 cannot be said to be "unrelated to the suppression of expression." Count One of the Indictment should therefore be dismissed.

The grossly disproportionate penalty the seven conspiracy Defendants face here when compared to the penalty for the underlying misdemeanor FACE charge is virtually unprecedented. As Judge Posner of the Seventh Circuit has observed, "[t]he proper punishment for conspiracy is a function of the gravity of the crime the defendants conspired to commit." *United States v. D'Antoni*, 874 F.2d 1214, 1221 (7th Cir. 1989) (Posner, J., concurring). Judge Posner further counseled that "[t]he principle that criminal sentences should be related to the gravity of the criminal conduct is [important], and deserves Congress's attention. Inadequate punishment can work a miscarriage of justice, just as excessive punishment can." *United States Id*. at 1222.

It is noteworthy that 18 U.S.C. § 371, Conspiracy to commit offense or to defraud United States, could have been charged here[32], but that statute **expressly limits the punishment** such that it is no greater than the punishment for the underlying misdemeanor. After setting forth the general penalty as an appropriate fine and/or imprisonment up to five years, it states: "If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, **the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor**." *Id.* (emphasis added); *see also* 18 U.S.C. § 373, Solicitation to commit a crime of violence (setting maximum punishment for conspiracy at one-half the maximum punishment for the crime). Thus, had the Government charged these Defendants under Section 371, the punishment for the conspiracy would be no greater than the punishment for the misdemeanor. That is proportionality; that is justice. "The proper punishment for conspiracy is a function of the gravity of the crime the defendants conspired to commit," as Judge Posner rightly stated. But in the Government's zeal to punish all who dare oppose abortion, the proper punishment for conspiracy is ten years' imprisonment and a fine of $250,000. That is not justice, it is abuse. *See* Hon. Grover M. Moscowitz, U.S. Dist. Ct. Judge for the Eastern Dist. Of N.Y., "Some Aspects of the Trial of A Criminal Case in the Federal Court," 3 F.R.D. 380, 392 (1944) (criticizing the "frequent resort by the government to the conspiracy and mail fraud statutes" -- "Violation of a misdemeanor statute is often changed to a felony by charging a conspiracy to do so.").

Moreover, the "conspiracy" here alleged consisted in a handful of Defendants using social media to promote "a series of anti-abortion events." *E.g.*, Indictment, ¶ 9; *see also id.* at ¶ 13 (Coleman Boyd post to Facebook: "Lord willing, our family will be doing a Face book live of

---

[32] *See*, *e.g.*, *United States v. Wilson*, 154 F.3d 658, 661 (7th Cir. 1998) (FACE defendants charged under 18 U.S.C. § 371).

some ministry activities tomorrow morning around 7 :45 AM central time. Please be in prayer towards this. Please plan to join us and share it if possible."). The Government has once again shown its hand, seeking to punish pure speech simply because its viewpoint is pro-life. This charge also proves the adage, "no good deed goes unpunished." Defendants, motivated by a desire to save and protect the life of the most innocent among us, find themselves indicted and charged with the harshest penalties conceivable simply because the Government takes a different view on the subject of abortion.

One line of cases addressing conspiracy holds that only those driven by a corrupt motive may be prosecuted for conspiracy. Originating in *People v. Powell*, 63 N.Y. 88 (1875), "[u]nder this principle, such a motive could be easily demonstrated if the underlying offense involved an act clearly wrongful in itself; but it had to be independently demonstrated if the acts agreed to were wrongful solely because of statutory proscription." *United States v. Feola*, 420 U.S. 671, 691 (1975) (citing also Note, Developments in the Law—Criminal Conspiracy, 72 Harv. L. Rev. 920, 936—937 (1959)). Defendants' motives were the antithesis of corrupt; they have instead dedicated themselves rather to sacrifice themselves in order to save others from mortal harm. The Government's overaggressive charge in this context is inexcusable and unjustifiable.

Additionally, denuded of its protection of the now-debunked right to abortion, FACE is devoid of specifying any particular right it purports to protect. The amorphous and ambiguous "right to obtain and seek . . . reproductive health services" fails to provide the degree of specificity necessary for a specific intent crime like Section 241. There can be no question that Section 241 is a specific intent crime. *Anderson v. United States*, 417 U.S. 211, 223 (1974) ("since the gravamen of the offense under s 241 is conspiracy, the prosecution must show that the offender acted with a specific intent to interfere with the federal rights in question") (citations

omitted). Consequently, "'charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes.'" *Id.* (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943)). *See also See*, *e.g.*, Adam G. Safwat, *Section 241 and the First Amendment: Avoiding a False Conflict Through Proper Mens Rea Analysis*, 43 Duke Law Journal 625, 626-27 (1993) ("because section 241 is an enforcement vehicle for federal statutory and constitutional rights, prosecutors must define the predicate right on which a section 241 charge is based . . . [and] must show that the defendant's state of mind satisfies the statute's specific intent requirement, namely, that the defendant has a purpose to deprive another of the enjoyment of his federal right. . . . These two elements are linked; to prove specific intent, one must first identify the right of which the defendant conspired to deny his victim.").

Unlike typical criminal statutes, FACE prohibits not all conduct interfering with access to "reproductive health services" but only those motivated by an improper motive. That improper motive, as shown previously, was opposition not to reproductive health services generally, but to abortion. In *Bray v. Alexandria Women Health Clinic*, 506 U.S. 263 (1993) – which was the impetus for introduction of the FACE Act in the first place -- the Supreme Court held that the federal right to abortion is not protected by federal law against a purely private conspiracy (i.e., one not involving state action by state officials). The Court further held that where private-person defendants conspired to deprive other persons of abortions and the conduct of the alleged conspirators had an incidental effect upon a right that is federally protected against private conduct (in that case interstate travel), the incidental effect does not bring the defendants within the purview of the federal conspiracy statute. Citing *Carpenter v. Scott*, 463 U.S. 825, the *Bray* Court held that a private conspiracy must be 'aimed at' the particular right that is protected from

47

deprivation by private conduct. Though addressing a plaintiff's civil charge under 42 U.S.C. 1985(3) against the defendants' private conspiracy to deprive them their right to abortion, the *Bray* Court observed that Section 241 is the criminal counterpart to § 1985(3), and applied the same legal principles to § 1985(3) that had been applied by the Court to Section 241. *See*, *e.g.*, *United States v. Williams*, 341 U.S. 70 (1951).

In the instant case, the Indictment makes clear that the charged Defendants planned and promoted an event aimed at opposing abortion. Under *Bray*, even before *Dobbs*, any incidental effect defendants had on a federally protected right would not be sufficient to bring their alleged private conspiracy within the scope of 18 U.S.C. § 241. For this reason, independent of *Dobbs*, the Indictment's charges of the seven Defendants for violation of § 241 must be dismissed. And when the *Bray* ruling is considered in light of *Dobbs*, it becomes even clearer – an alleged conspiracy to stop criminal activity (abortion under *Dobbs*) and petition the state government to act against that criminal activity, even if it had some incidental effect on a federally protected right, is not sufficient to bring the private conspiracy under the scope of 18 U.S.C. § 241.

Finally, Congress could not have been clearer in its intention that first offense violations of FACE be charged as misdemeanors. The Government's ginned up felony conspiracy charge conflicts with both the spirit and the letter of FACE and is directly contradictory to the intent of Congress. FACE was enacted in 1994. The Government has prosecuted FACE cases continuously over the entire twenty-nine (29) years since, both civilly and criminally. But never before, during that entire time, has the Government ever charged a conspiracy under Section 241 in connection with a FACE case, no matter how extreme the alleged violation. To employ it now, under these circumstances, suggests an ulterior motive, to say the least.

In conclusion, Count One of the Indictment, alleging a violation of 18 U.S.C. § 241 by these seven Defendants, should be dismissed.

## Conclusion

For all the foregoing reasons, Defendants respectfully move this Court for an order dismissing the Indictment and all charges in this case.

Respectfully submitted,

**/s/ _Stephen M. Crampton_**
STEPHEN M. CRAMPTON
Thomas More Society
P.O. Box 4506
Tupelo, MS  38803
(662) 255-9439
scrampton@thomasmoresociety.org

and

LARRY L. CRAIN, Esq.
5214 Maryland Way, Suite 402
Brentwood, TN  37027
(615) 376-2600
larry@crainlaw.legal
www.crainlaw.legal

*Attorneys for Paul Vaughn*

**/s/ _Jodie A. Bell. (by permission)_**
JODIE A. BELL, Esq.
214 Second Avenue North, Suite 208
Nashville, TN  37201
(615)244-1110/ (615) 956-4977

*Attorney for Chester Gallagher*

**/s/ *William Conway (by permission)***
WILLIAM J. CONWAY, Esq.
214 Second Avenue North, Suite 208
Nashville, TN 37201
(615) 250-5363
wjconway@gmail.com

*Attorney for Heather Idoni*

**/s/ *G. Kerry Haymaker (by permission)***
G. KERRY HAYMAKER, Esq.
Haymaker & Heroux, P.C.
545 Mainstream Drive, Suite 420
Nashville, TN 37228
(615) 250-0050
haymaker@tennesseedefense.com

and

**/s/ *Steve C. Thornton  (by permission)***
STEVE C. THORNTON, Esq.
P.O. Box 16465
Jackson, MS 39236
(601) 982-0313
mail@lawlives.com

*Attorneys for Defendant Coleman Boyd*

**/s/ *Heather G. Parker (by permission)***
HEATHER G. PARKER
Evans Bulloch Parker PLLC
302 North Spring Street
PO Box 398
Murfreesboro, TN 37133-0398
(615) 896-4154
heatherparker@bfhelaw.com

*Attorney for Defendant Caroline Davis*
**/s/ *Manuel B. Russ (by permission)***
MANUEL B. RUSS
340 21st Avenue North
Nashville, TN 37203
(615) 329-1919
russben@gmail.com

*Attorney for Defendant Dennis Green*

50

**/s/ *David R. Heroux (by permission)***
DAVID R. HEROUX, P.C.
Haymaker & Heroux, P.C.
545 Mainstream Drive, Suite 420
Nashville, TN 37228
(615) 250-0050
heroux@tennesseedefense.com

*Attorney for Defendant Eva Ed*

**/s/ *David L. Cooper (by permission)***
DAVID L. COOPER
Law Office of David L. Cooper, P.C.
208 Third Avenue, N Suite 300
Nashville, TN 37201
(615) 256-1008
dcooper@cooperlawfirm.com

*Attorney for Defendant Eva Zastrow*

**/s/ *Rayburn McGowan, Jr. (by permission)***
RAYBURN McGOWAN, Jr.
8005 Church Street East, Suite 219
Brentwood, TN 37207
(615) 244-7070
mcgowanrayburnjr@bellsouth.net

*Attorney for Defendant James Zastrow*

**/s/ *Leonard E. Lucas, III (by permission)***
LEONARD E. LUCAS, III
The Law Firm of Leonard Earl Lucas
315 Deadrick St, Suite 1550
Nashville, TN 37238
(301) 204-6498
leonard.lucas@lellawfirm.com

*Attorney for Defendant Paul Place*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Motion to Continue was filed

electronically and served on the following by the EF/CME electronic filing system:

JODIE A. BELL
214 Second Avenue North, Suite 208
Nashville, TN 37201
(615)244-1110/ (615) 956-4977
jodie@attorneyjodiebell.com
Attorney for Chester Gallagher

MANUEL B. RUSS
340 21st Avenue North
Nashville, TN 37203
(615) 329-1919
russben@gmail.com
Attorney for Defendant Dennis Green

WILLIAM J. CONWAY
William J. Conway, Esq. P.C.
214 Second Avenue North, Suite 208
Nashville, TN 37201
(615) 260-5364
wjconway@gmail.com
Attorney for Defendant Heather Idoni

DAVID R. HEROUX
Haymaker & Heroux, P.C.
545 Mainstream Drive, Suite 420
Nashville, TN 37228
(615) 250-0050
heroux@tennesseedefense.com
Attorney for Defendant Eva Edl

ROBERT LYNN PARRIS
Robert L. Parris, Attorney at Law
200 Jefferson Avenue, Suite 1500
Memphis, TN 38103
(615) 490-8026
rlp@robertparrisattorney.com
Attorney for Defendant Calvin Zastrow

DAVID L. COOPER
Law Office of David L. Cooper, P.C.
208 Third Avenue, N Suite 300
Nashville, TN 37201
(615) 256-1008
dcooper@cooperlawfirm.com
Attorney for Defendant Eva Zastrow

G. KERRY HAYMAKER
Haymaker & Heroux, P.C.
545 Mainstream Drive. Suite 420
Nashville, TN 37228
(615) 250-0050
haymaker@tennesseedefense.com
Attorney for Defendant Coleman Boyd

RAYBURN McGOWAN, Jr.
8005 Church Street East, Suite 219
Brentwood, TN 37207
(615) 244-7070
mcgowanrayburnjr@bellsouth.net
Attorney for Defendant James Zastrow

STEVE C. THORNTON, Esq.
P.O. Box 16465
Jackson, MS 39236
(601) 982-0313
mail@lawlives.com
Attorney for Defendant Coleman Boyd

LEONARD E. LUCAS, III
The Law Firm of Leonard Earl Lucas
315 Deadrick St, Suite 1550
Nashville, TN 37238
(301) 204-6498
leonard.lucas@lellawfirm.com
Attorney for Defendant Paul Place

HEATHER G. PARKER
Evans Bulloch Parker PLLC
302 North Spring Street
PO Box 398
Murfreesboro, TN 37133-0398
(615) 896-4154
heatherparker@bfhelaw.com
Attorney for Defendant Caroline Davis

LARRY LAMONT CRAIN
5214 Maryland Way, Suite 402
Brentwood, TN 37207
(615) 376-2600
larry@crainlaw.legal
Attorney for Defendant Paul Vaughn

STEPHEN M. CRAMPTON
Thomas More Society
P.O. Box 4506
Tupelo, MS 38803
(662) 255-9439
scrampton@thomasmoresociety.org
Attorney for Defendant Paul Vaughn

AMANDA J. KLOPF
U.S. Attorney's Office (Nashville)
719 Church Street, Suite 3300
Nashville, TN 37203
(615) 736-5151
amanda.klopf@usdoj.gov
Representing **USA**

SANJAY PATEL
Department of Justice
150 M Street NE
Washington, DC 20002
(202) 598-1018
Sanjay.patel@usdoj.gov
Representing **USA**

NIKHIL A. RAMNANEY
Department of Justice
150 M Street NE
Washington, DC 20002
(202) 598-1018
nikhil.ramnaney@usdoj.gov
Representing **USA**

This the 9th day of March, 2023.

/s/ Stephen M. Crampton
STEPHEN M. CRAMPTON